WO

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| E*Trade Financial Corporation,<br><br>    Plaintiff,<br><br>v.<br><br>Lance Eaton,<br><br>    Defendant. | No. CV-17-02471-PHX-JJT<br><br>**ORDER** |

At issue is Plaintiff E*Trade Financial Corporation's Motion for Preliminary Injunction (Doc. 52, Pl's Mot.), to which Defendant Lance Eaton filed a Response (Doc. 74, Def's Resp.). Also at issue is Eaton's own Motion for Preliminary Injunction (Doc. 58, Def's Mot.), to which E*Trade filed a Response (Doc. 73, Pl's Resp.). After the parties conducted limited discovery, the Court held an evidentiary hearing on the competing motions for preliminary injunction on April 6, 2018 and entertained extensive argument from the parties (Doc. 86, Apr. 6, 2018 Tr.).

The parties' filings in support of, and in opposition to, the respective motions for preliminary injunction and the transcript of the hearing set forth in detail the facts of the matter. The Court will not recite them here except as necessary to its analysis below.

**I.   STANDARD**

In order to obtain a preliminary injunction, a movant must show that "(1) [they] are] likely to succeed on the merits, (2) [they are] likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in [their] favor, and (4) an

injunction is in the public interest." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (*citing Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 9 (2008)). The Ninth Circuit, employing a sliding scale analysis, has also stated "'serious questions going to the merits' and a hardship balance that tips sharply toward the [movant] can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1078 (9th Cir. 2013) *cert. denied*, 134 S. Ct. 2877 (2014) (quoting *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011)).

**I. ANALYSIS**

    **A. E*Trade's Motion for Preliminary Injunction**

        **1. Likelihood of Success on the Merits**

E*Trade grounds its motion for injunctive relief on three claims: 1) its claim for breach of the duty of loyalty owed by Eaton to E*Trade during the existence of their fiduciary relationship; 2) its claim for breach of the employment contract between the parties; and 3) its claim for intentional interference by Eaton with E*Trade's business and contractual relations with its clients. (Pl's Mot. at 8.) The Court examines E*Trade's likelihood of success on these claims, respectively.

            **a. Breach of Duty of Loyalty**

An employee owes an employer a fiduciary duty. *Taser Int'l, Inc. v. Ward*, 231 P.3d 921, 926 (Ariz. Ct. App. 2010) (internal citations omitted). "One aspect of this broad principle is that an employee is precluded from actively competing with his [] employer during the period of employment." *Id.* (internal citations omitted). While the Court finds below that E*Trade likely will succeed in showing that Eaton did compete with it after he left E*Trade's employ, it does not similarly find E*Trade likely will succeed in showing that same active competition during his employment.

The evidence before the Court at this preliminary stage of litigation shows that in the two to three days just before Eaton resigned from E*Trade, he accessed the client files, which were the property of E*Trade, for about half of his approximately 100 clients

at E*Trade. But no party produced evidence that Eaton contacted any of those clients to alert them of his departure from E*Trade, let alone solicited them to follow him, while he was still employed by E*Trade. The evidence, when fully developed and presented to the FINRA arbitration panel, may at that point demonstrate other acts by Eaton constituting competition on or before July 6, 2017, while he was still an employee of E*Trade and thus owed it a duty of loyalty. No such showing has been made to this point.

The Court grants that the inordinate amount of time Eaton spent accessing so many client records on July 3 and 4, 2017, could well be preparatory to an attempt to solicit those clients. But that activity is properly addressed, as an analytical matter, as evidence of a potential breach of the non-solicitation clause of the employment agreement as set forth below. At the time Eaton accessed the E*Trade client files, he had authorization to do so, he was tasked with serving those clients as an employee of E*Trade, and even if he did so to access the clients' contact information, without more at that point the Court cannot conclude he likely breached his duty of loyalty. E*Trade's claim for breach of duty of loyalty is thus insufficient as a basis for its motion for preliminary injunction in light of the evidence E*Trade has shown thus far.

### b. Breach Of Contractual Non-Solicitation Provision

E*Trade's breach of contract claim stands in a different light. The "Nonsolicitation and Nondisclosure Agreement" ("Agreement") Eaton entered into with E*Trade on May 16, 2011 provided that he would not "copy, take, send or remove" without permission, among other things, any of E*Trade's records, client lists, electronic data or other materials containing "Confidential Information." (Doc. 54-1, Agreement ¶ 4.) The Agreement defines Confidential Information, in relevant part, as client lists, "[i]nformation regarding [E*Trade]'s clients" and contact information. (*Id.*) The Agreement also provided, in a section entitled "Nonsolicitation of Clients," that

> [d]uring the term of [Eaton]'s employment with [E*Trade] and for a period of one year from [any termination, Eaton] will not, directly or indirectly, solicit, induce, or attempt to solicit or induce, any Client or Potential Client of [E*Trade] to purchase from [Eaton] or any other person, firm,

> partnership, corporation, limited liability company or other entity, goods or services competitive with those offered and/or provided by [Eaton] during [his] previous two years of employment with [E*Trade] or that [Eaton] possessed Confidential Information about during [his] employment with [E*Trade].

(*Id.* ¶ 6.) Finally, the Agreement required Eaton, upon termination, to return to E*Trade

> all documents, copies, recordings of any kind, papers, computer records or programs, drawings, manuals, letters, notes, notebooks, reports, formulae, memoranda, client lists, and other material in [his] possession or under [his] control that relate to [E*Trade]'s business and that [Eaton] obtained in connection with employment with [E*Trade].

(*Id.* ¶ 7.)

E*Trade presented evidence at the hearing that Eaton violated each of these three provisions of the Agreement. Eaton admitted at the hearing that he left his employment with E*Trade having retained in his cell phone contact information for approximately ten clients, and that retention of confidential client information was a violation of paragraph seven of the Agreement. (Apr. 6, 2018 Tr. at 30–31.) From this evidence alone, the Court can conclude Eaton breached Paragraphs 4 and 7 of the Agreement, by taking client contact information and not returning or deleting it upon or after his departure from E*Trade. Proof of these breaches, by themselves, however, does not satisfy E*Trade's burden to show likelihood of success on the merits of the contract claim. The remaining elements of a contract claim are causation and damages, and the Court sees no evidence that these specific breaches by themselves caused harm to E*Trade.

But the Court also concludes that E*Trade succeeded in showing Eaton breached Paragraph 5 of the Agreement as well, which prohibited him from soliciting or attempting to solicit, directly or indirectly, many E*Trade clients, whom he had served while employed at E*Trade, within the year after he left, and indeed within days of his termination. Eaton acknowledged during examination that he contacted or attempted to contact roughly half of his 100 prior E*Trade clients from July 7 through early August,

2017. He either spoke to each of those approximately fifty clients by telephone or left them a message seeking a telephonic conversation.

Eaton asserted in his briefing and at the hearing that his purpose in attempting to contact those approximately fifty clients was to comply with regulations applicable to him as a Certified Financial Planner. The CFPB Rules of Conduct required Eaton, in relevant part, to disclose to his clients "[c]ontact information for the certificant and, if applicable, the certificant's employer." Rule 2.2(d), Rules of Certified Financial Planner Board of Standards. "The certificant shall timely disclose to the client any changes to the above information." *Id.*, Rule 2.2. Neither party disputes, and the Court agrees, that Eaton's contacting of former clients in service of this regulatory requirement would be privileged and would not constitute a breach of the Agreement, so long as the contact achieves only the purposes of providing the required notification.

Ultimately Eaton spoke with more than thirty but less than the entire fifty former clients he sought to contact. Eaton testified that when he spoke to each of those clients, he advised them that he had left E*Trade, that he was now working for Morgan Stanley, and he was notifying the client of his new contact information. Eaton also acknowledged that in at least several cases, he followed that notification by asking if the person had any questions. He also testified that, of the clients he asked whether they had any questions, some did and some did not, and of those who did, some asked how they could follow him to Morgan Stanley. Eaton also testified that he only discussed the possibility of the client moving to Morgan Stanley if the client initiated the subject, by either indicating a desire to move with him or asking questions about the possibility of a move. Of the roughly forty E*Trade clients Eaton ultimately spoke with by telephone, approximately thirty moved their accounts to Morgan Stanley and Eaton after those contacts.

E*Trade also presented several texts from Eaton to former E*Trade clients during the relevant time period. In one string dated July 14, 2017, Eaton texted J.N., a former E*Trade client who had already decided to move her account with Eaton to Morgan Stanley as follows: "[t]ry beating some sense into [D.N.]. He should come on to my

Noah's ark. Lol. He can always transfer back." (Doc. 80, Pl's Ex. 32.) Eaton confirmed in testimony that D.N. was J.N.'s ex-husband and separately a client of E*Trade's whom Eaton had served. He also confirmed that by "Noah's ark," he was referring to Morgan Stanley, and in referencing "transfer[ring] back," he meant transferring back to E*Trade. (Apr. 6, 2018 Tr. at 37–38.) Shortly thereafter, J.N responded that "[she] text[ed D.N.] to ask him if he's moving with you!! He gave me this emoji. 🤔 🤔 I asked what his concerns are? He responded. From [D.N.] - None really. I'll do it! So…he's moving with you my friend. 🙂 " (Pl's Ex. 32.)

From this text string, the Court must conclude that Eaton had had a prior communication with D.N. wherein the two discussed the possibility of D.N. moving his accounts to Morgan Stanley. Discussion of that topic may have been initiated by Eaton, which would have violated the Agreement, or it may have been initiated by a question from D.N., as Eaton testified was the only way such a topic would have come up. That cannot be known by anyone except the participants in the conversation. What is known is that when such conversation ended, D.N. had not made up his mind to move his accounts to Morgan Stanley. Thereafter, as shown above, Eaton urged J.N. to approach D.N. about moving his accounts, and J.N. clearly did exactly what he asked. That constitutes indirect solicitation of D.N, initiated by Eaton's request to J.N., in violation of Paragraph 5's non-solicitation clause. While Eaton testified, and his counsel argued, that J.N. has become a personal friend and his text to her was just "banter," the Court finds this unpersuasive. J.N. acted on the request. It yielded a new client for Eaton, directly at E*Trade's expense.

This single exchange, the Court finds, demonstrates that E*Trade is likely to succeed on the merits in proving Eaton solicited, either directly or indirectly, his former E*Trade client D.N. to move his investment accounts from E*Trade to Morgan Stanley. That constitutes a breach of at least Paragraph 5 of the Agreement, which caused the loss to E*Trade of D.N.'s accounts and the fees associated with facilitating, servicing and managing them. Moreover, it is undisputed that, for those clients to whom he did reach out, Eaton would never leave his new Morgan Stanley contact information by text or

- 6 -

email, but insisted always on conveying the information during a telephone conversation. This strongly suggests that his real purpose in contacting the former clients, under the conditions he would impose, was to maximize the possibility of them—not just D.N., but as many former clients as possible—coming over to him at Morgan Stanley after a conversation of which there was no electronic record. The conclusion becomes even more evident when considered with the following facts.

Eaton testified that he only tried to contact only about fifty of his roughly 100 former clients at E*Trade. He also testified that when E*Trade clients did not respond to his requests for a telephonic visit, he never followed up by simply sending them his new contact information. This means that the roughly fifty former clients whom he never reached out to, and the additional ten to fifteen who would not take his call—together a majority of former clients—never received Eaton's new contact information, which he testified he was required to provide them under CFPB licensing rules.

All of the above leads the Court to conclude for purposes of this Motion that in 1) contacting only select, former clients at E*Trade, 2) insisting on conveying the news about his switching firms only in a live and real-time conversation with the former client, and then 3) never following up to provide his new contact information to those former clients who did not assent to a telephone call, Eaton's primary purpose was to solicit their business to him and away from E*Trade, within the one-year prohibition period of Paragraph 5 of the Agreement. The evidence and argument of counsel indicates that E*Trade, and presumably Morgan Stanley, both valued Eaton as a highly capable salesman and a motivated, aggressive client relationship builder. This was reinforced by his testimony. It is highly likely that several of Eaton's former clients, upon learning of his move to Morgan Stanley would, without more, desire to move with him.[1] At what rate, the Court cannot know. But before the Court is persuasive evidence that in at least

---

[1] Eaton submitted declarations from six clients who had moved from E*Trade to Morgan Stanley, each indicating that Eaton's service was a motivating factor and stating that he did not solicit their move. The evidence is uncontroverted as to these clients, and as the Court indicates above, Eaton's level of client service would be expected to motivate several clients to follow him, without more.

one instance, Eaton clearly crossed the line between mere notification and solicitation, and the combination of circumstances in all of his contacts with former clients, engineered by Eaton as set forth above, makes it very likely that 1) solicitation was at least one of his goals, 2) solicitation occurred in not just the one clear instance but in many cases, and 3) it had the desired effect with an unknown number of clients. E*Trade has shown a likelihood of success on the merits of its contract claim.

      **c.**     **Intentional or Tortious Interference Claim**

For the same reasons, E*Trade is likely to succeed on its tortious or intentional interference with contractual expectations claim. As of July 6, 2017 and until they transferred their accounts to Morgan Stanley, E*Trade had a valid business expectancy or contractual relationship with all of the moving clients. Eaton was aware of this relationship in all cases. As set forth above in detail, Eaton's solicitation of D.N. at a minimum and likely others constituted an intentional interference with those existing relationships which caused termination thereof. And as a result of such terminations, E*Trade was damaged by losing that expectancy, in the form of lost accounts, under management or otherwise. *See Neonatology Assocs., Ltd. v. Phoenix Perinatal Assocs., Inc.*, 164 P.3d 691, 693 (Ariz. Ct. App. 2007).

     **2.**    **Irreparable Harm**

Irreparable harm is harm for which there is no adequate remedy at law, such as money damages. *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014). E*Trade correctly cites *Doran v. Salem Inn, Inc.*, for the proposition that a "substantial loss of business," absent injunctive relief, constitutes irreparable harm. 422 U.S. 922, 932 (1975). And while the loss of revenue associated with client accounts definitively identified as having moved as a result of solicitation in breach of the Agreement can be quantified, the loss of follow-on business, goodwill and reputation flowing from such breach or interference cannot be so compensated. *See Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013). The Court concludes that E*Trade has sufficiently shown that irreparable harm will occur without injunctive relief.

### 3. Balance of the Equities

The hardship E*Trade will suffer if no injunctive relief lies is set forth above. The Court balances that against the hardship suffered by Eaton if an injunction issues. As the parties acknowledge and the Court agrees, injunctive relief purporting to require termination of the clients Eaton has already acquired from E*Trade is both practically unworkable and likely beyond the Court's authority. Such an order also would fail to respect the rights and wishes of the non-party clients as to who should manage their investment accounts. As Eaton's counsel rightly pointed out at argument, this would be equally true for any E*Trade clients who are in the process of transferring their accounts to Morgan Stanley as of the issuance of this Order. An injunction 1) requiring Eaton to destroy any E*Trade client information for those persons who have not moved with him and are not in the process of moving with him, and 2) prohibiting him from having any contact with those persons for the remainder of the prohibition period set forth in the Agreement, poses little no hardship on Eaton in the Court's view. First, as a signatory of the Agreement, he was aware of the non-solicitation condition at the time he signed it and at all times since. Second, it has been over nine months since Eaton's departure from E*Trade, and approximately eight months since, according to his testimony, he concluded contacting those former clients he chose to contact. If Eaton were at all interested in contacting the approximately sixty remaining former clients in order to satisfy his CFPB requirements, he would have done so by now, and certainly had ample time to do so. The balance of hardships tips strongly in favor of E*Trade.

### 4. Whether an Injunction is in the Public Interest

The Court recognizes that client contact information is of critical value in many industries, including the wealth management industry. And while Eaton may be correct that a person's name is public information, when that name is associated with that person's status as a client, whether of a lawyer, a plastic surgeon, a private investigator or an investment advisor, such information is confidential, precisely because of their status as a client and their desire to keep private matters private. This is certainly so in the case

of an industry where client status translates directly into high net worth, and there is an inference that Eaton culled through the approximately 100 former clients and identified that minority subset which he did contact based at least in part on net worth or volume of assets available for management.

"[T]he public interest is served by protecting a company's right to proprietary information, business operations and contractual rights." *Compass Bank v. Hartley*, 430 F. Supp. 2d 973, 983 (D. Ariz. 2006) (internal citations omitted). The Court finds an injunction as described above is in the public interest here.

### 5. Equitable Defense of Unclean Hands

Eaton argues that the Court should grant no equitable relief to E*Trade because the firm comes to the Court with unclean hands. He asserts that E*Trade's actions in delaying and attempting to obstruct the transfer of the thirty accounts that followed him to Morgan Stanley were undertaken in bad faith.

The Court reviewed the evidence, including Mr. Mastellone's testimony at the hearing and the exhibits submitted by the parties on this issue. The Court is not persuaded that Eaton has made a showing of unclean hands on the evidence as it currently exists.

The evidence before the Court indicated that E*Trade offers clients at least two types of accounts that are qualitatively different from each other. A client can opt for a managed account, which provides active advice, implementation of trades on a client's behalf, and associated services, all from an E*Trade employee—this type of service is one traditionally or historically associated with the brokerage and wealth management services industry. In the alternative, a client can establish a "self-directed" account, in which the client largely or exclusively does their own analysis and executes trades and position changes directly online, without the facilitation by an E*Trade consultant or relationship manager. These two types of accounts and their associated levels of services entail commensurately differing fee structures, and a client can have accounts of more than one type. Because E*Trade offered at least these two types of qualitatively different accounts, its business operations included procedures that would have reflected that difference.

The Mastellone testimony and associated emails demonstrated at least two firm practices at E*Trade that could result, and did result, in account transfers for departing clients being slower than they otherwise might be. First, when a client wished to transfer an account from E*Trade to another financial services provider, E*Trade employed a procedure requiring that a managed account must be terminated and converted to a self-directed account before the firm would process a request to transfer that account out of E*Trade. One effect of this procedure was that if an E*Trade client with a managed account submitted a request to transfer an account while the account was still open as a managed account, E*Trade's system would reject and cancel the request, and under the process, the client would be required to resubmit the transfer request after the managed account had been terminated and converted to a self-directed account. This occurred at least once with every one of the twenty-nine accounts belonging to clients seeking to move to Morgan Stanley with Eaton. Mastellone testified that this process requirement had been in place for at least three and a half years prior to the hearing, and that the rejection and cancellation of transfer requests for accounts still under management, even those that may be in process for termination and conversion to self-directed accounts, is an automatic step undertaken uniformly in every such case by E*Trade's computerized case flow management system without any human intervention.

Second, E*Trade employed a procedure, upon receiving a client request for transfer of an account to another institution, to contact the client to confirm that the client had actually made the request and it was in fact the client's desire to transfer their funds out. Although E*Trade did not develop through evidence the operation of this process feature as fully as they did the transfer request rejection and cancellation feature, the Court understands that the E*Trade workflow system implemented the verification procedure by taking no action toward submitting a workflow request to begin termination of a managed account until it had completed verification of the client's transfer or termination request. The effect of these two procedures in tandem, as seen in the instance of the E*Trade client accounts that moved to Morgan Stanley after Eaton, was to

lengthen the account transfer process. In the case of those twenty-nine accounts, the average time from submission of an account termination workflow request through managed account termination and transfer of account assets was just less than sixteen calendar days. The cycle for some of the accounts at issue was as little as eight calendar days and for one as much as thirty-four days. In each of those cycles a transfer request was rejected and cancelled by E*Trade's system at least once, and in one case as many as three times.

Eaton produced a declaration from Yvette Parris, a Business Services Manager at Morgan Stanley, stating in relevant part that, based on her experience at Morgan Stanley, "in total, once a client indicates an intention and desire to transfer [an account], the entire process can take as little as thirty minutes to an hour to complete." (Doc. 74-9, Parris Decl. at 1–2.) Eaton submits that the difference in processing time between what Ms. Parris has experienced at Morgan Stanley and what the departing E*Trade clients experienced in July and August of 2017 demonstrates a bad faith effort by E*Trade to obstruct the transfers of Eaton's clients. The Parris Declaration also states that E*Trade's rejection of "virtually every transfer submitted" by the clients moving to Eaton "was highly irregular, and in [Parris's] fourteen years in the industry, [she had] never experienced the number of rejected transfers that occurred in this matter." (*Id.* at 2.)

While the Court is respectful of Ms. Parris's experience, it finds Eaton's argument here insufficiently persuasive to show unclean hands. First, Ms. Parris's statement that account transfers can be cycled from request to completion in as little as thirty minutes to an hour, and in any event should not take as many days as they did here to complete, is based on her experience working for Morgan Stanley only, so far as the Court can tell from her declaration. Eaton produced no evidence that Morgan Stanley offers the same services as E*Trade that would impact on the number of process steps—and therefore the amount of time—necessary to complete a transfer. E*Trade's provision of both managed accounts and self-directed accounts, per Mastellone's testimony, necessitates additional steps to convert "apples to apples" among accounts and to settle fees that apply to

- 12 -

managed accounts but not to self-directed accounts before a transfer may be undertaken without harming the E*Trade business model. If Morgan Stanley does not deal with similar issues, Ms. Parris's experience about transfer request compliance time is not helpful to the analysis.

Neither is the Court persuaded by Eaton's citation to FINRA Rule 2140, which provides in relevant part that

> "[N]o member or person associated with a member shall interfere with a customer's request to transfer his or her account in connection with the change in employment of the customer's registered representative where the account is not subject to any lien for monies owed by the customer or other bona fide claim."

FINRA, Rule 2140 (2010). Whether E*Trade interfered with the transfer requests associated with any of the twenty-nine accounts at issue will be decided by the FINRA panel on a fully developed record; at this point, the Court concludes it is still an open question. Eaton asserts the fact that every one of the accounts that moved to him at Morgan Stanley from E*Trade experienced one or more rejections of transfer requests, and the transfers took not hours but days, weeks or in one case a month, shows E*Trade singled out his clients for obstruction of their account transfers. But this is impossible to know unless compared to the transfer requests for accounts not associated with Eaton over the same time period, and that information is not before the Court.[2] The Court does have before it evidence that the procedural steps applied in the work flow processing of the termination and transfer requests for the twenty-nine accounts, and the resultant rejections of earlier transfer requests and time delays in completing the transfers as set forth above, are uniformly consistent with E*Trade's process for all managed accounts,

---

[2] At the Preliminary Injunction hearing, counsel for Eaton pointed out that he sought, during the limited discovery phase of this matter, data on other rejected requests at E*Trade but the Court determined it to be outside the bounds of the discovery ordered. This is a consequence of the matter reaching the Court in the posture of a motion for temporary injunctive relief, wherein the Court attempted to reasonably tailor the scope of discovery to match the preliminary nature of the proceedings and the needs of the case at that point.

whether belonging to clients moving to Eaton or otherwise. Moreover, the evidence before the Court is that, although each transfer request took between eight and thirty-four days to complete, all were in fact completed, and each client seeking to transfer their accounts to Morgan Stanley ultimately did so.

The Court notes that the delays caused by both 1) E*Trade's stated request verification procedure and 2) its programmatic rejection and cancellation of transfer orders submitted before the managed accounts had been terminated and converted to self-directed accounts, are the result of choices that no doubt anger and frustrate clients seeking to move, and may have negative business and other consequences. But unless it is shown that E*Trade singled out the clients seeking to transfer their accounts to Eaton for exposure to these procedures, and or that the procedures violate applicable law, regulation or contract, E*Trade's actions do not constitute unclean hands.[3]

The Court will grant E*Trade's motion for a Preliminary Injunction. Pursuant to Paragraph 9 of the Agreement, E*Trade shall post no bond.

**B.  Eaton's Motion for Preliminary Injunction**

Eaton filed a conditional Motion for Preliminary Injunction in this matter (Doc. 58), in that he sought reciprocal injunctive relief against E*Trade only if the Court grants injunctive relief for E*Trade that would prohibit him from contacting or working with clients. Because the affirmative injunctive relief the Court grants E*Trade does not prohibit Eaton from communicating or working with those former E*Trade clients who have moved with him or are in the process of moving with him from July 7, 2017, to the

---

[3] Ms. Parris further stated in her declaration that "[p]er FINRA regulations, upon submission of a properly completed ACAT form, the prior firm must process that transfer request within two business days." (Parris Decl. at 2.) For the same reason as discussed above, this statement does not sufficiently demonstrate unclean hands. First, no party submitted a citation to a specific FINRA regulation or rule so providing. Second, and more importantly, even if E*Trade's transfer request processing regime were found to violate a time limit imposed by FINRA regulation, the Court would have to find E*Trade targeted Eaton's clients with that process in order to conclude E*Trade comes with unclean hands. *Dollar Sys., Inc. v. Avcar Leasing Sys., Inc.*, 890 F.2d 165, 173 (9th Cir. 1989).

date of this Order, the Court finds the condition which would trigger Eaton's asserted need for reciprocal injunctive relief is not met.

While Eaton states in his Motion that E*Trade should be enjoined to take certain affirmative actions if the Court grants E*Trade relief "in any form," including enjoining Eaton from contacting former clients he has not yet solicited, the Court concludes that is simply not warranted. First among the actions Eaton would seek to impose on E*Trade under a reciprocal injunction would be to require E*Trade to convey Eaton's current contact information at Morgan Stanley to the approximately sixty former clients whom he either did not contact before or whom he did contact but who did not go with him. Eaton has maintained he was obligated by CFPB rules to provide any changed contact information to all clients. As the Court observed above, at least for the approximately fifty former clients at E*Trade that Eaton never contacted at all, he has had nine months to do so. Yet there is no evidence before the Court that he has made any effort on his own, while unconstrained by this Court or any other mechanism, to make such contact. The Court will not require E*Trade to do what Eaton could have done for himself yet apparently deliberately did not do. It will deny Eaton's Motion for Preliminary Injunction (Doc. 58).

For the reasons set forth above,

IT IS ORDERED granting Plaintiff's Motion for Preliminary Injunction (Doc. 52).

IT IS FURTHER ORDERED:

1) prohibiting Eaton from further using E*Trade's confidential information, as defined in the Agreement, regarding any account of a person who was a client of Eaton's at E*Trade who has not transferred their accounts to Morgan Stanley or was not in the process of doing so as of the date of this Order;

2) prohibiting Eaton from further soliciting E*Trade clients through July 7, 2018; and

3) requiring Eaton to return immediately all E*Trade confidential information susceptible of physical transfer, and to delete immediately any such

information not susceptible to physical transfer, such as client contact information for current or former E*Trade clients contained on a cellular telephone, that does not pertain to clients who have moved to Morgan Stanley or were in the process of so moving as of the date of this Order.

IT IS FURTHER ORDERED denying Defendant's Motion for Preliminary Injunction (Doc. 58.)

IT IS FURTHER ORDERED directing the Clerk of Court to terminate this matter.

Dated this 24th day of April, 2018.

Honorable John J. Tuchi
United States District Judge